# EXHIBIT D

**Enforcement Terms**

A.    **Implementation Timeline.**  Ocwen (hereinafter "Servicer") anticipates that it will phase in the implementation of the Servicing Standards, using a grid approach that prioritizes implementation based upon: (i) the importance of the Servicing Standard to the borrower; and (ii) the difficulty of implementing the Servicing Standard.  In addition to the Servicing Standards that have been implemented upon entry of this Consent Judgment, the period for implementation will be within 60 days of entry of this Consent Judgment.  For Metrics 6.D.i, 30, and 31 in Schedule D-1 hereto, the period for implementation will be within 180 days of entry of this Consent Judgment.  For Metrics 32 and 33 in schedule D-1 hereto, the period for implementation will be within 90 days of entry of this Consent Judgment.  In the event that Servicer, using reasonable efforts, is unable to implement certain standards on the specified timetable, Servicer may apply to the Monitor for a reasonable extension of time to implement those standards or requirements.

B.    **Monitoring Committee.**  A committee comprising of representatives of the state Attorneys General, State Mortgage Regulators and the Consumer Financial Protection Bureau ("CFPB") shall monitor Servicer's compliance with this Consent Judgment (the "Monitoring Committee").  The Monitoring Committee may substitute representation, as necessary.  Subject to Section F, the Monitoring Committee may share all Monitor Reports, as that term is defined in Section D.3 below, with any releasing party.

C.    **Monitor**

*Retention and Qualifications and Standard of Conduct*

1.    Pursuant to an agreement of the parties, Joseph A. Smith Jr. is appointed to the position of Monitor under the Consent Judgment.  If the Monitor is at any time unable to complete his or her duties under the Consent Judgment, Servicer and the Monitoring Committee shall mutually agree upon a replacement in accordance with the process and standards set forth in this Section C and Paragraph V.7 of the Consent Judgment.

2.    Such Monitor shall be highly competent and highly respected, with a reputation that will garner public confidence in his or her ability to perform the tasks required under this Consent Judgment.  The Monitor shall have the right to employ an accounting firm or firms or other firm(s) with similar capabilities to support the Monitor in carrying out his or her duties under the Consent Judgment.  Monitor and Servicer shall agree on the selection of a "Primary Professional Firm," which must have adequate capacity and resources to perform the work required under this agreement.  The Monitor shall also have the right to engage one or more attorneys or other professional persons to represent or assist the Monitor in carrying

out the Monitor's duties under the Consent Judgment (each such individual, along with each individual deployed to the engagement by the Primary Professional Firm, shall be defined as a "Professional").  The Monitor and Professionals will collectively possess expertise in the areas of mortgage servicing, loss mitigation, business operations, compliance, internal controls, accounting, and foreclosure and bankruptcy law and practice.  The Monitor and Professionals shall at all times act in good faith and with integrity and fairness towards all the Parties.

3.   The Monitor and Professionals shall not have any prior relationships with the Parties that would undermine public confidence in the objectivity of their work and, subject to Section C.3(e), below, shall not have any conflicts of interest with any Party.

   (a)   The Monitor and Professionals will disclose, and will make a reasonable inquiry to discover, any known current or prior relationships to, or conflicts with, any Party, any Party's holding company, any subsidiaries of the Party or its holding company, directors, officers, and law firms.

   (b)   The Monitor and Professionals shall make a reasonable inquiry to determine whether there are any facts that a reasonable individual would consider likely to create a conflict of interest for the Monitor or Professionals.  The Monitor and Professionals shall disclose any conflict of interest with respect to any Party.

   (c)   The duty to disclose a conflict of interest or relationship pursuant to this Section C.3 shall remain ongoing throughout the course of the Monitor's and Professionals' work in connection with this Consent Judgment.

   (d)   All Professionals shall comply with all applicable standards of professional conduct, including ethics rules and rules pertaining to conflicts of interest.

   (e)   To the extent permitted under prevailing professional standards, a Professional's conflict of interest may be waived by written agreement of the Monitor and Servicer.

   (f)   Servicer or the Monitoring Committee may move the Court for an order disqualifying any Professionals on the grounds that such Professional has a conflict of interest that has inhibited or could inhibit the Professional's ability to act in good faith and with integrity and fairness towards all Parties.

4.   The Monitor must agree not to be retained by any Party, or its successors or assigns, for a period of two years after the conclusion of the terms of the engagement.  Any Professionals who work on the engagement must

agree not to work on behalf of Servicer, or its successor or assigns, for a period of one year after the conclusion of the term of the engagement (the "Professional Exclusion Period").  Any Firm that performs work with respect to Servicer on the engagement must agree not to perform work on behalf of Servicer, or its successor or assigns, that consists of advising Servicer on a response to the Monitor's review during the engagement and for a period of six months after the conclusion of the term of the engagement (the "Firm Exclusion Period").  The Professional Exclusion Period, Firm Exclusion Period, and terms of exclusion may be altered on a case-by-case basis upon written agreement of Servicer and the Monitor. The Monitor shall organize the work of any Firms so as to minimize the potential for any appearance of, or actual, conflicts.

*Monitor's Responsibilities*

5.      It shall be the responsibility of the Monitor to determine whether Servicer is in compliance with the Servicing Standards and whether Servicer has satisfied the Consumer Relief Requirements, in accordance with the authorities provided herein, and to report his or her findings as provided in Section D.3, below.

6.      The manner in which the Monitor will carry out his or her compliance responsibilities under this Consent Judgment and, where applicable, the methodologies to be utilized shall be set forth in a work plan agreed upon by Servicer and the Monitor, and not objected to by the Monitoring Committee (the "Work Plan").

*Internal Review Group*

7.      Servicer will designate an internal quality control group that is independent from the line of business whose performance is being measured (the "Internal Review Group") to perform compliance reviews each calendar quarter ("Quarter") in accordance with the terms and conditions of the Work Plan (the "Compliance Reviews") and in satisfaction of the Consumer Relief Requirements after the (A) end of each calendar year (and, in the discretion of the Servicer, any Quarter) and (B) earlier of the Servicer's assertion that it has satisfied its obligations thereunder and the third anniversary of the Start Date (the "Satisfaction Review").  For the purposes of this provision, a group that is independent from the line of business shall be one that does not perform operational work on mortgage servicing, and ultimately reports to a Chief Risk Officer, Chief Audit Executive, Chief Compliance Officer, or another employee or manager who has no direct operational responsibility for mortgage servicing.

8.      The Internal Review Group shall have the appropriate authority, privileges, and knowledge to effectively implement and conduct the reviews and metric assessments contemplated herein and under the terms and conditions of the Work Plan.

9.      The Internal Review Group shall have personnel skilled at evaluating and validating processes, decisions, and documentation utilized through the implementation of the Servicing Standards.  The Internal Review Group may include non-employee consultants or contractors working at Servicer's direction.

10.     The qualifications and performance of the Internal Review Group will be subject to ongoing review by the Monitor.  Servicer will appropriately remediate the reasonable concerns of the Monitor as to the qualifications or performance of the Internal Review Group.

*Work Plan*

11.     Servicer's compliance with the Servicing Standards shall be assessed via metrics identified and defined in Schedule D-1 hereto, as supplemented by and consistent with the metrics provided in the National Mortgage Settlement 2012 Consent Judgment and any additional metrics that may be developed in accordance with Section C.22 below ("the "Metrics").  The threshold error rates for the Metrics are set forth in Schedule D-1 (as supplemented from time to time in accordance with Section C.22, below, the "Threshold Error Rates").  The Internal Review Group shall perform test work to compute the Metrics each Quarter, and report the results of that analysis via the Compliance Reviews.  The Internal Review Group shall perform test work to assess the satisfaction of the Consumer Relief Requirements within 45 days after the (A) end of each calendar year (and, in the discretion of the Servicer, any Quarter) and (B) earlier of (i) the end of the Quarter in which Servicer asserts that it has satisfied its obligations under the Consumer Relief Provisions and (ii) the Quarter during which the third anniversary of the Start Date occurs, and report that analysis via the Satisfaction Review.

12.     Servicer and the Monitor shall reach agreement on the terms of the Work Plan within 90 days of the entry of the Consent Judgment, which time can be extended for good cause by agreement of Servicer and the Monitor.  If such Work Plan is not objected to by the Monitoring Committee within 20 days, the Monitor shall proceed to implement the Work Plan.  In the event that Servicer and the Monitor cannot agree on the terms of the Work Plan within 90 days or the agreed upon terms are not acceptable to the Monitoring Committee, Servicer and Monitoring Committee or the Monitor shall jointly petition the Court to resolve any disputes.  If the Court does not resolve such disputes, then the Parties shall submit all

remaining disputes to binding arbitration before a panel of three arbitrators. The Servicer and the Monitoring Committee shall each appoint one arbitrator, and those two arbitrators shall appoint a third.  The Servicer may submit a Work Plan that will satisfy the terms of this Consent Judgment and the terms of the National Mortgage Settlement 2012 Consent Judgment.

13.     The Work Plan may be modified from time to time by agreement of the Monitor and Servicer.  If such amendment to the Work Plan is not objected to by the Monitoring Committee within 20 days, the Monitor shall proceed to implement the amendment to the Work Plan.  To the extent possible, the Monitor shall endeavor to apply the Servicing Standards uniformly across all Servicers.

14.     The following general principles shall provide a framework for the formulation of the Work Plan:

(a)     The Work Plan will set forth the testing methods and agreed procedures that will be used by the Internal Review Group to perform the test work and compute the Metrics for each Quarter.

(b)     The Work Plan will set forth the testing methods and agreed procedures that will be used by Servicer to report on its compliance with the Consumer Relief Requirements of this Consent Judgment, including, incidental to any other testing, confirmation of state-identifying information used by Servicer to compile state-level Consumer Relief information as required by Section D.2.

(c)     The Work Plan will set forth the testing methods and procedures that the Monitor will use to assess Servicer's reporting on its compliance with the Consumer Relief Requirements of this Consent Judgment.

(d)     The Work Plan will set forth the methodology and procedures the Monitor will utilize to review the testing work performed by the Internal Review Group.

(e)     The Compliance Reviews and the Satisfaction Review may include a variety of audit techniques that are based on an appropriate sampling process and random and risk-based selection criteria, as appropriate and as set forth in the Work Plan.

(f)     In formulating, implementing, and amending the Work Plan, Servicer and the Monitor may consider any relevant information relating to patterns in complaints by borrowers, issues or

deficiencies reported to the Monitor with respect to the Servicing Standards, and the results of prior Compliance Reviews.

(g)     The Work Plan should ensure that Compliance Reviews are commensurate with the size, complexity, and risk associated with the Servicing Standard being evaluated by the Metric.

(h)     Following implementation of the Work Plan, Servicer shall be required to compile each Metric beginning in the first full Quarter after the period for implementing the Servicing Standards associated with the Metric, or any extension approved by the Monitor in accordance with Section A, has run.

*Monitor's Access to Information*

15.     So that the Monitor may determine whether Servicer is in compliance with the Servicing Standards, Servicer shall provide the Monitor with its regularly prepared business reports analyzing Executive Office servicing complaints (or the equivalent); access to all Executive Office servicing complaints (or the equivalent) (with appropriate redactions of borrower information other than borrower name and contact information to comply with privacy requirements); and, if Servicer tracks additional servicing complaints, quarterly information identifying the three most common servicing complaints received outside of the Executive Office complaint process (or the equivalent).  In the event that Servicer substantially changes its escalation standards or process for receiving Executive Office servicing complaints (or the equivalent), Servicer shall ensure that the Monitor has access to comparable information.

16.     So that the Monitor may determine whether Servicer is in compliance with the Servicing Standards, Servicer shall notify the Monitor promptly if Servicer becomes aware of reliable information indicating Servicer is engaged in a significant pattern or practice of noncompliance with a material aspect of the Servicing Standards.

17.     Servicer shall provide the Monitor with access to all work papers prepared by the Internal Review Group in connection with determining compliance with the Metrics or satisfaction of the Consumer Relief Requirements in accordance with the Work Plan.

18.     If the Monitor becomes aware of facts or information that lead the Monitor to reasonably conclude that Servicer may be engaged in a pattern of noncompliance with a material term of the Servicing Standards that is reasonably likely to cause harm to borrowers or with any of the Consumer Relief Requirements, the Monitor shall engage Servicer in a review to determine if the facts are accurate or the information is correct.

19.     Where reasonably necessary in fulfilling the Monitor's responsibilities under the Work Plan to assess compliance with the Metrics or the satisfaction of the Consumer Relief Requirements, the Monitor may request information from Servicer in addition to that provided under Sections C.16-19.  Servicer shall provide the requested information in a format agreed upon between Servicer and the Monitor.

20.     Where reasonably necessary in fulfilling the Monitor's responsibilities under the Work Plan to assess compliance with the Metrics or the satisfaction of the Consumer Relief Requirements, the Monitor may interview Servicer's employees and agents, provided that the interviews shall be limited to matters related to Servicer's compliance with the Metrics or the Consumer Relief Requirements, and that Servicer shall be given reasonable notice of such interviews.

*Monitor's Powers*

21.     Where the Monitor reasonably determines that the Internal Review Group's work cannot be relied upon or that the Internal Review Group did not correctly implement the Work Plan in some material respect, the Monitor may direct that the work on the Metrics (or parts thereof) be reviewed by Professionals or a third party other than the Internal Review Group, and that supplemental work be performed as necessary.

22.     If the Monitor becomes aware of facts or information that lead the Monitor to reasonably conclude that Servicer may be engaged in a pattern of noncompliance with a material term of the Servicing Standards that is reasonably likely to cause harm to borrowers or tenants residing in foreclosed properties, the Monitor shall engage Servicer in a review to determine if the facts are accurate or the information is correct.  If after that review, the Monitor reasonably concludes that such a pattern exists and is reasonably likely to cause material harm to borrowers or tenants residing in foreclosed properties, the Monitor may propose an additional Metric and associated Threshold Error Rate relating to Servicer's compliance with the associated term or requirement.  Any additional Metrics and associated Threshold Error Rates (a) must be similar to the Metrics and associated Threshold Error Rates contained in Schedule D-1, (b) must relate to material terms of the Servicing Standards, (c) must either (i) be outcomes-based (but no outcome-based Metric shall be added with respect to any Mandatory Relief Requirement) or (ii) require the existence of policies and procedures required by the Servicing Standards, in a manner similar to Metrics 5.B-E, and (d) must be distinct from, and not overlap with, any other Metric or Metrics.  Notwithstanding the foregoing, the Monitor may add a Metric that satisfies (a)-(c) but does not

satisfy (d) of the preceding sentence if the Monitor first asks the Servicer to propose, and then implement, a Corrective Action Plan, as defined below, for the material term of the Servicing Standards with which there is a pattern of noncompliance and that is reasonably likely to cause material harm to borrowers or tenants residing in foreclosed properties, and the Servicer fails to implement the Corrective Action Plan according to the timeline agreed to with the Monitor.

23. If Monitor proposes an additional Metric and associated Threshold Error Rate pursuant to Section C.22, above, Monitor, the Monitoring Committee, and Servicer shall agree on amendments to Schedule D-1 to include the additional Metrics and Threshold Error Rates provided for in Section C.22, above, and an appropriate timeline for implementation of the Metric. If Servicer does not timely agree to such additions, any associated amendments to the Work Plan, or the implementation schedule, the Monitor may petition the court for such additions.

24. Any additional Metric proposed by the Monitor pursuant to the processes in Sections C.22 or C.23 and relating to provision VIII.B.1 of the Servicing Standards shall be limited to Servicer's performance of its obligations to comply with (1) the federal Protecting Tenants at Foreclosure Act and state laws that provide comparable protections to tenants of foreclosed properties; (2) state laws that govern relocation assistance payments to tenants ("cash for keys"); and (3) state laws that govern the return of security deposits to tenants.

## D.   Reporting

### *Quarterly Reports*

1. Following the end of each Quarter, Servicer will report the results of its Compliance Reviews for that Quarter (the "Quarterly Report"). The Quarterly Report shall include: (i) the Metrics for that Quarter; (ii) Servicer's progress toward meeting its payment obligations under this Consent Judgment; and (iii) general statistical data on Servicer's overall servicing performance described in Schedule Y. Except where an extension is granted by the Monitor, Quarterly Reports shall be due no later than 45 days following the end of the Quarter and shall be provided to: (1) the Monitor, and (2) the Board of Servicer or a committee of the Board designated by Servicer. The first Quarterly Report shall cover the first full Quarter after this Consent Judgment is entered.

2. Following the end of each Quarter, Servicer will transmit to each state a report (the "State Report") including general statistical data on Servicer's servicing performance, such as aggregate and state-specific information regarding the number of borrowers assisted and credited activities

conducted pursuant to the Consumer Relief Requirements as set forth in
Schedule Y.  The State Report will be delivered simultaneous with the
submission of the Quarterly Report to the Monitor.  Servicer shall provide
copies of such State Reports to the Monitor and Monitoring Committee.

*Monitor Reports*

3.       The Monitor shall report on Servicer's compliance with this Consent
Judgment in periodic reports setting forth his or her findings (the "Monitor
Reports").  The first three Monitor Reports will each cover two Quarterly
Reports.  If the first three Monitor Reports do not find Potential Violations
(as defined in Section E.1, below), each successive Monitor Report will
cover four Quarterly Reports, unless and until a Quarterly Report reveals a
Potential Violation (as defined in Section E.1, below).  In the case of a
Potential Violation, the Monitor may (but retains the discretion not to)
submit a Monitor Report after the filing of each of the next two Quarterly
Reports, provided, however, that such additional Monitor Report(s) shall
be limited in scope to the Metric or Metrics as to which a Potential
Violation has occurred.

4.       Prior to issuing any Monitor Report, the Monitor shall confer with
Servicer and the Monitoring Committee regarding its preliminary findings
and the reasons for those findings.  Servicer shall have the right to submit
written comments to the Monitor, which shall be appended to the final
version of the Monitor Report.  Final versions of each Monitor Report
shall be provided simultaneously to the Monitoring Committee and
Servicers within a reasonable time after conferring regarding the
Monitor's findings.  The Monitor Reports shall be filed with the Court
overseeing this Consent Judgment and shall also be provided to the Board
of Servicer or a committee of the Board designated by Servicer.

5.       The Monitor Report shall: (i) describe the work performed by the Monitor
and any findings made by the Monitor during the relevant period, (ii) list
the Metrics and Threshold Error Rates, (iii) list the Metrics, if any, where
the Threshold Error Rates have been exceeded, (iv) state whether a
Potential Violation has occurred and explain the nature of the Potential
Violation,  (v) state whether any Potential Violation has been cured, and
(vi) state whether the Servicer has complied with the Other Requirements
set forth in Sections B.9 and 12 of Exhibit C of this Consent Judgment.  In
addition, following each Satisfaction Review, the Monitor Report shall
report on the Servicer's satisfaction of the Consumer Relief Requirements,
including regarding the number of borrowers assisted and number and
dollar amount of credited loan modifications conducted pursuant to the
Consumer Relief Requirements, and identify any material inaccuracies
identified in prior State Reports.  Except as otherwise provided herein, the

Monitor Report may be used in any court hearing, trial, or other proceeding brought pursuant to the Consent Judgment pursuant to Section J, below, and shall be admissible in evidence in a proceeding brought under the Consent Judgment pursuant to Section I, below.  Such admissibility shall not prejudice Servicer's right and ability to challenge the findings and/or the statements in the Monitor Report as flawed, lacking in probative value, or otherwise.  The Monitor Report with respect to a particular Potential Violation shall not be admissible or used for any purpose if Servicer cures the Potential Violation pursuant to Section E, below.

### Satisfaction of Payment Obligations

6.      Upon the satisfaction of any category of payment obligation under this Consent Judgment, Servicer, at its discretion, may request that the Monitor certify that Servicer has discharged such obligation.  Provided that the Monitor is satisfied that Servicer has met the obligation, the Monitor may not withhold and must provide the requested certification.  Any subsequent Monitor Report shall not include a review of Servicer's compliance with that category of payment obligation.

### Compensation

7.      Within 120 days of entry of this Consent Judgment, the Monitor shall, in consultation with the Monitoring Committee and Servicer, prepare and present to Monitoring Committee and Servicer an annual budget providing its reasonable best estimate of all fees and expenses of the Monitor to be incurred during the first year of the term of this Consent Judgment, including the fees and expenses of Professionals and support staff (the "Monitoring Budget").  On a yearly basis thereafter, the Monitor shall prepare an updated Monitoring Budget providing its reasonable best estimate of all fees and expenses to be incurred by Ocwen during that year.  Absent an objection within 20 days, a Monitoring Budget or updated Monitoring Budget shall be implemented.  Consistent with the Monitoring Budget, Servicer shall pay all fees and expenses of the Monitor, including the fees and expenses of Professionals and support staff.  The fees, expenses, and costs of the Monitor, Professionals, and support staff shall be reasonable.  Servicer may apply to the Court to reduce or disallow fees, expenses, or costs that are unreasonable.

## E.      Potential Violations and Right to Cure

1.      A "Potential Violation" of this Consent Judgment occurs if the Servicer has exceeded the Threshold Error Rate set for a Metric in a given Quarter.  In the event of a Potential Violation, Servicer shall meet and confer with

the Monitoring Committee within 15 days of the Quarterly Report or Monitor Report indicating such Potential Violation.

2.     Servicer shall have a right to cure any Potential Violation.

3.     Subject to Section E.4, a Potential Violation is cured if (a) a corrective action plan approved by the Monitor (the "Corrective Action Plan") is determined by the Monitor to have been satisfactorily completed in accordance with the terms thereof; and (b) a Quarterly Report covering the Cure Period reflects that the Threshold Error Rate has not been exceeded with respect to the same Metric and the Monitor confirms the accuracy of said report using his or her ordinary testing procedures.  The "Cure Period" shall be the first full quarter after completion of the Corrective Action Plan or, if the completion of the Corrective Action Plan occurs within the first month of a Quarter and if the Monitor determines that there is sufficient time remaining, the period between completion of the Corrective Action Plan and the end of that Quarter.

4.     If after Servicer cures a Potential Violation pursuant to the previous section, another violation occurs with respect to the same Metric, then the second Potential Violation shall immediately constitute an uncured violation for purposes of Section I.3, provided, however, that such second Potential Violation occurs in either the Cure Period or the Quarter immediately following the Cure Period.

5.     In addition to the Servicer's obligation to cure a Potential Violation through the Corrective Action Plan, Servicer must remediate any material harm to particular borrowers identified through work conducted under the Work Plan.  In the event that a Servicer has a Potential Violation that so far exceeds the Threshold Error Rate for a metric that the Monitor concludes that the error is widespread, Servicer shall, under the supervision of the Monitor, identify other borrowers who may have been harmed by such noncompliance and remediate all such harms to the extent that the harm has not been otherwise remediated.

6.     In the event a Potential Violation is cured as provided in Sections E.3, above, then no Party shall have any remedy under the Consent Judgment (other than the remedies in Section E.5) with respect to such Potential Violation.

F.     **Confidentiality**

1.     These provisions shall govern the use and disclosure of any and all information designated as "CONFIDENTIAL," as set forth below, in documents (including email), magnetic media, or other tangible things provided by the Servicer to the Monitor in this case, including the subsequent disclosure by the Monitor to the Monitoring Committee of

such information.  In addition, it shall also govern the use and disclosure of such information when and if provided to the Plaintiff States, State Mortgage Regulators, or the CFPB.

2.  The Monitor may, at his discretion, provide to the Monitoring Committee or to a participating state, State Mortgage Regulator, or the CFPB any documents or information received from the Servicer related to a Potential Violation or related to the review described in Section C.19; provided, however, that any such documents or information so provided shall be subject to the terms and conditions of these provisions.  Nothing herein shall be construed to prevent the Monitor from providing documents received from the Servicer and not designated as "CONFIDENTIAL" to a participating state or the CFPB.

3.  The Servicer shall designate as "CONFIDENTIAL" that information, document or portion of a document or other tangible thing provided by the Servicer to the Monitor, the Monitoring Committee or to any participating state, State Mortgage Regulator, or the CFPB that Servicer believes contains a trade secret or confidential research, development, or commercial information subject to protection under applicable state or federal laws (collectively, "Confidential Information").  These provisions shall apply to the treatment of Confidential Information so designated.

4.  Except as provided by these provisions, all information designated as "CONFIDENTIAL" shall not be shown, disclosed or distributed to any person or entity other than those authorized by these provisions. Participating states, State Mortgage Regulators, and the CFPB agree to protect Confidential Information to the extent permitted by law.

5.  This agreement shall not prevent or in any way limit the ability of a participating state, State Mortgage Regulator, or the CFPB to comply with any subpoena, Congressional demand for documents or information, court order, request under the Right to Financial Privacy Act, or a state or federal public records or state or federal freedom of information act request; provided, however, that in the event that a participating state or the CFPB receives such a subpoena, Congressional demand, court order or other request for the production of any Confidential Information covered by this Order, the state, State Mortgage Regulator, or CFPB shall, unless prohibited under applicable law or unless the state or CFPB would violate or be in contempt of the subpoena, Congressional demand, or court order, (1) notify the Servicer of such request as soon as practicable and in no event more than ten (10) calendar days of its receipt or three calendar days before the return date of the request, whichever is sooner, and (2) allow the Servicer ten (10) calendar days from the receipt of the notice to obtain a protective order or stay of production for the documents or information

sought, or to otherwise resolve the issue, before the state, State Mortgage Regulator, or CFPB discloses such documents or information. In all cases covered by this Section, the state, State Mortgage Regulator, or CFPB shall inform the requesting party that the documents or information sought were produced subject to the terms of these provisions.

G. **Dispute Resolution Procedures.** Servicer, the Monitor, and the Monitoring Committee will engage in good faith efforts to reach agreement on the proper resolution of any dispute concerning any issue arising under the Consent Judgment, including any dispute or disagreement related to the withholding of consent, the exercise of discretion, or the denial of any application. Subject to Section I, below, in the event that a dispute cannot be resolved, Servicer, the Monitor, or the Monitoring Committee may petition the Court for resolution of the dispute. Where a provision of this agreement requires agreement, consent of, or approval of any application or action by a Party or the Monitor, such agreement, consent or approval shall not be unreasonably withheld.

H. **Consumer Complaints.** Nothing in this Consent Judgment shall be deemed to interfere with existing consumer complaint resolution processes, and the Parties are free to bring consumer complaints to the attention of Servicer for resolution outside the monitoring process. In addition, Servicer will continue to respond in good faith to individual consumer complaints provided to it by the Consumer Financial Protection Bureau, State Attorneys General or State Mortgage Regulators in accordance with the routine and practice existing prior to the entry of this Consent Judgment, whether or not such complaints relate to Covered Conduct released herein.

I. **Enforcement**

1. **Consent Judgment.** This Consent Judgment shall be filed in the U.S. District Court for the District of Columbia and shall be enforceable therein. Servicer and the Releasing Parties shall waive their rights to seek judicial review or otherwise challenge or contest in any court the validity or effectiveness of this Consent Judgment. Notwithstanding such waiver, any State Party may bring an action in that Party's state court to enforce the Judgment. Servicer and the Releasing Parties agree not to contest any jurisdictional facts, including the Court's authority to enter this Consent Judgment.

2. **Enforcing Authorities.** Servicer's obligations under this Consent Judgment shall be enforceable in the U.S. District Court for the District of Columbia or in the state court of any State Party that brings an action to enforce the Judgment. An enforcement action under this Consent Judgment may be brought by any Party to this Consent Judgment or the Monitoring Committee. Monitor Report(s) and Quarterly Report(s) shall not be admissible into evidence by a Party to this Consent Judgment,

except in an action in the Court or state court to enforce this Consent Judgment.  In addition, unless immediate action is necessary in order to prevent irreparable and immediate harm, prior to commencing any enforcement action, the CFPB, the State Mortgage Regulator of one of the Plaintiff States that are parties to this Consent Judgment, or the Attorney General of one of the Plaintiff States that are parties to this Consent Judgment must provide notice to the Monitoring Committee of its intent to bring an action to enforce this Consent Judgment.  The members of the Monitoring Committee shall have no more than 21 days to determine whether to bring an enforcement action.  If the members of the Monitoring Committee decline to bring an enforcement action, the Party must wait 21 additional days after such a determination by the members of the Monitoring Committee before commencing an enforcement action.

3.     **Enforcement Action.**  In the event of an action to enforce the obligations of Servicer and to seek remedies for an uncured Potential Violation for which Servicer's time to cure has expired, the sole relief available in such an action will be:

(a)     Equitable Relief.  An order directing non-monetary equitable relief, including injunctive relief, directing specific performance under the terms of this Consent Judgment, or other non-monetary corrective action.

(b)     Civil Penalties.  The Court or state court may award as civil penalties an amount not more than $1 million per uncured Potential Violation; or, in the event of a second uncured Potential Violation of Metrics 1.a, 1.b, or 2.a (*i.e.*, a Servicer fails the specific Metric in a Quarter, then fails to cure that Potential Violation, and then in subsequent Quarters fails the same Metric again in a Quarter and fails to cure that Potential Violation again in a subsequent Quarter), where the final uncured Potential Violation involves widespread noncompliance with that Metric, the Court or state court may award as civil penalties an amount not more than $5 million for the second uncured Potential Violation.

Nothing in this Section shall limit the availability of remedial compensation to harmed borrowers as provided in Section E.5.

(c)     Any penalty or payment owed by Servicer pursuant to the Consent Judgment shall be paid to the clerk of the Court or state court or as otherwise agreed by the Monitor and the Servicer and distributed by the Monitor as follows:

1.     In the event of a penalty based on a violation of a term of the Servicing Standards, the penalty shall be allocated, first,

to cover the costs incurred by any party in prosecuting the violation.

2.     In the event of a payment due under Paragraph B.11 of Exhibit C, one-third of the payment shall be allocated to the CFPB, one-third shall be allocated to the Plaintiff State Attorneys General to this Consent Judgment, and one-third shall be allocated to the State Mortgage Regulators that are parties to the separate Stipulation and Consent Agreement with Ocwen identified in this Consent Judgment.

J.     **Sunset.**  This Consent Judgment and all Exhibits shall retain full force and effect for three years from the date it is entered (the "Term"), unless otherwise specified in the Exhibit.  Servicer shall submit a final Quarterly Report for the last quarter or portion thereof falling within the Term, and shall cooperate with the Monitor's review of said report, which shall be concluded no later than six months following the end of the Term, after which time Servicer shall have no further obligations under this Consent Judgment.

**Servicing Standards Quarterly Compliance Metrics**

| Executive Summary |
|---|
| **Sampling:** (a) A random selection of the greater of 100 loans and a statistically significant sample.  (b) Sample will be selected from the population as defined in column E |
| **Review and Reporting Period:** Results will be reported Quarterly and 45 days after the end of the quarter. |
| **Errors Definition:** An error is a measurement in response to a test question related to the Servicing Standards that results in the failure of the specified outcome.  Errors in response to multiple questions with respect to a single outcome would be treated as only a single error. |

## Metrics Tested

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| **Metric** | **Measurements** | **Loan Level Tolerance for Error**[1] | **Threshold Error Rate**[2] | **Test Loan Population and Error Definition** | **Test Questions** |
| **1. Outcome Creates Significant Negative Customer Impact** | | | | | |
| A. Foreclosure sale in error | Customer is in default, legal standing to foreclose, and the loan is not subject to active trial, or BK. | n/a | 1% | **Population Definition**: Foreclosure Sales that occurred in the review period.<br><br>A. **Sample** :# of Foreclosure Sales in the review period that were tested.<br><br>B. **Error Definition**: # of loans that went to foreclosure sale in error due to failure of any one of the test questions for this metric.<br><br>Error Rate = B/A | 1. Did the foreclosing party have legal standing to foreclose?<br>2. Was the borrower in an active trial period plan (unless the servicer took appropriate steps to postpone sale)?<br>3. Was the borrower offered a loan modification fewer than 14 days before the foreclosure sale date (unless the borrower declined the offer or the servicer took appropriate steps to postpone the sale)?<br>4. Was the borrower not in default (unless the default is cured to the satisfaction of the Servicer or investor within 10 days before the foreclosure sale date and the Servicer took appropriate steps to postpone sale)?<br>5. Was the borrower protected from foreclosure by Bankruptcy (unless Servicer had notice of such protection fewer than 10 days before the foreclosure sale date and Servicer took appropriate steps to postpone sale)? |

| A | B | | C | D | E | F |
|---|---|---|---|---|---|---|
| **Metric** | **Measurements** | | **Loan Level Tolerance for Error**[1] | **Threshold Error Rate**[2] | **Test Loan Population and Error Definition** | **Test Questions** |
| B. Incorrect Mod denial | Program eligibility, all documentation received, DTI test, NPV test. | | 5% On income errors | 5% | **Population Definition:** Modification Denied In the Review Period. **Error Definition:** # of loans that were denied a modification as a result of failure of anyone of the test questions for this metric. | 1. Was the evaluation of eligibility Inaccurate ( as per HAMP, Fannie, Freddie or proprietary modification criteria)? 2. Was the income calculation inaccurate? 3. Were the inputs used in the decision tool (NPV and Waterfall test) entered in error or inconsistent with company policy? 4. Was the loan NPV positive? 5. Was there an inaccurate determination that the documents received were incomplete? |
| **2. Integrity of Critical Sworn Documents** | | | | | | |
| A. Was AOI properly prepared | Based upon personal knowledge, properly notarized, amounts agree to system of record within tolerance if overstated. | | Question 1, Y/N; Question 2, Amounts overstated (or, for question on Escrow Amounts, understated) by the greater of $99 or 1% of the Total Indebtedness Amount | 5% | **Population Definition:** Affidavits of indebtedness filed in the review period. **Error Definition:** For question 1, yes; for question 2, the # of Loans where the sum of errors exceeds the allowable threshold. | 1. Taken as a whole and accounting for contrary evidence provided by the Servicer, does the sample indicate systemic issues with either affiants lacking personal knowledge or improper notarization? 2. Verify all the amounts outlined below against the system of record: a. Was the correct principal balance used Was the correct interest amount (and per diem) used? b. Was the escrow balance correct? c. Were correct other fees used? d. Was the correct corporate advance balance used? e. Was the correct late charge balance used? f. Was the suspense balance correct? g. Was the total indebtedness amount on the Affidavit correct? |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| **Metric** | **Measurements** | **Loan Level Tolerance for Error[1]** | **Threshold Error Rate[2]** | **Test Loan Population and Error Definition** | **Test Questions** |
| B. POC | Accurate statement of pre-petition arrearage to system of record. | Amounts over stated by the greater of $50 or 3% of the correct Pre-Petition Arrearage | 5% | **Population Definition:** POCs filed in the review period.<br><br>**Error Definition:** # of Loans where sum of errors exceeds the allowable threshold. | 1.  Are the correct amounts set forth in the form, with respect to pre-petition missed payments, fees, expenses charges, and escrow shortages or deficiencies? |
| C. MRS Affidavits | Customer is in default and amount of arrearage is within tolerance. | Amounts overstated (or for escrows amounts, understated) by the greater of $50 or 3% of the correct Post Petition Total Balance | 5% | **Population Definition:** Affidavits supporting MRS's filed in the review period<br><br>**Error Definition:** # of Loans where the sum of errors exceeds the allowable threshold. | 1.  Verify against the system of record, within tolerance if overstated:<br>a.  the post-petition default amount;<br>b.  the amount of fees or charges applied to such pre-petition default amount or post- petition amount since the later of the date of the petition or the preceding statement; and<br>c.  escrow shortages or deficiencies. |

D1-4

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Metric | Measurements | Loan Level Tolerance for Error[1] | Threshold Error Rate[2] | Test Loan Population and Error Definition | Test Questions |
| **3. Pre-foreclosure Initiation** | | | | | |
| A.  Pre Foreclosure Initiation | Accuracy of Account information. | Amounts over stated by the greater of $99 or 1% of the Total balance | 5% | **Population Definition:** Loans with a Foreclosure referral date in the review period.  **Error Definition:** # of Loans that were referred to foreclosure with an error in any one of the foreclosure initiation test questions**.** | ** Verify all the amounts outlined below against the system of record.  1.   Was the loan delinquent as of the date the first legal action was filed? 2.   Was information contained in the Account Statement completed accurately? a.   The total amount needed to reinstate or bring the account current, and the amount of the principal; b.   The date through which the borrower's obligation is paid; c.   The date of the last full payment; d.   The current interest rate in effect for the loan; e.   The date on which the interest rate may next reset or adjust; f.   The amount of any prepayment fee to be charged, if any; g.   A description of any late payment fees; and h.   A telephone number or electronic mail address that may be used by the obligor to obtain information regarding the mortgage. |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| **Metric** | **Measurements** | **Loan Level Tolerance for Error**[1] | **Threshold Error Rate**[2] | **Test Loan Population and Error Definition** | **Test Questions** |
| B.  Pre Foreclosure Initiation Notifications | Notification sent to the customer supporting right to foreclose along with: Applicable information upon customers request, Account statement information, Ownership statement, and Loss Mitigation statement. Notifications required before 14 days prior to referral to foreclosure. | N/A | 5% | **Population Definition:** Loans with a Foreclosure referral date in the review period.<br><br>**Error Definition:** # of Loans that were referred to foreclosure with an error in any one of the foreclosure initiation test questions. | 1.  Were all the required notification statements mailed no later than 14 days prior to first Legal Date (i) Account Statement; (ii) Ownership Statement; and (iii) Loss Mitigation Statement?<br>2.  Did the Ownership Statement accurately reflect that the servicer or investor has the right to foreclose?<br>3.  Was the Loss Mitigation Statement complete and did it accurately state that:<br>  a.  The borrower was ineligible (if applicable); or<br>  b.  The borrower was solicited, was the subject of right party contact routines, and that any timely application submitted by the borrower was evaluated? |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| **Metric** | **Measurements** | **Loan Level Tolerance for Error**[1] | **Threshold Error Rate**[2] | **Test Loan Population and Error Definition** | **Test Questions** |
| **4. Accuracy and Timeliness of Payment Application and Appropriateness of Fees** | | | | | |
| A. Fees adhere to guidance (Preservation fees, Valuation fees and Attorney's fees) | Services rendered, consistent with loan instrument, within applicable requirements. | Amounts over stated by the greater of $50 or 3% of the Total Default Related Fees Collected | 5% | **Population Definition:**  Defaulted loans (60 +) with borrower payable default related fees* collected.<br><br>**Error Definition:**  # of loans where the sum of default related fee errors exceeds the threshold.<br><br>* Default related fees are defined as any fee collected for a default-related service after the agreement date. | For fees collected in the test period:<br>1.  Was the frequency of the fees collected (in excess of what is consistent with state guidelines or fee provisions in servicing standards?<br>2.  Was amount of the fee collected higher than the amount allowable under the Servicer's Fee schedule and for which there was not a valid exception? |
| B. Adherence to customer payment processing | Payments posted timely (within 2 business days of receipt) and accurately. | Amounts understated by the greater $50.00 or 3% of the scheduled payment | 5% | **Population Definition:** All subject payments posted within review period.<br><br>**Error Definition:**  # of loans with an error in any one of the payment application test questions. | 1.  Were payments posted to the right account number?<br>2.  Were payments posted in the right amount?<br>3.  Were properly identified conforming payments posted within 2 business days of receipt and credited as of the date of receipt?<br>4.  Did servicer accept payments within $50.00 of the scheduled payment, including principal and interest and where applicable taxes and insurance as required by the servicing standards?<br>5.  Were partial payments credited to the borrower's account as of the date that the funds cover a full payment?<br>6.  Were payments posted to principal interest and escrow before fees and expenses? |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| **Metric** | **Measurements** | **Loan Level Tolerance for Error**[1] | **Threshold Error Rate**[2] | **Test Loan Population and Error Definition** | **Test Questions** |
| C. Reconciliation of certain waived fees. (I.b.11.C) | Appropriately updating the Servicer's systems of record in connection with the reconciliation of payments as of the date of dismissal of a debtor's Chapter 13 bankruptcy case, entry of an order granting Servicer relief from the stay under Chapter 13, or entry of an order granting the debtor a discharge under Chapter 13, to reflect the waiver of any fee, expense or charge pursuant to paragraphs III.B.1.c.i or III.B.1.d of the Servicing Standards **(within applicable tolerances)**. | Amounts over stated by the greater of $50 or 3 % of the correct reconciliation amount | 5% | **Population Definition:**  All accounts where in-line reconciliation routine is completed within review period.<br><br>**Error Definition:**  # of loans with an error in the reconciliation routine resulting in overstated amounts remaining on the borrower account. | 1.  Were all required waivers of Fees, expense or charges applied and/or corrected accurately as part of the reconciliation? |
| D. Late fees adhere to guidance | Late fees are collected only as permitted under the Servicing Standards **(within applicable tolerances)**. | Y/N | 5% | **Population Definition:**  All late fees collected within the review period.<br><br>**Error Definition:**  # of loans with an error on any one of the test questions. | 1.  Was a late fee collected with respect to a delinquency attributable solely to late fees or delinquency charges assessed on an earlier payment? |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Metric | Measurements | Loan Level Tolerance for Error[1] | Threshold Error Rate[2] | Test Loan Population and Error Definition | Test Questions |
| **5. Policy/Process Implementation** | | | | | |
| A. Third Party Vendor Management | Is periodic third party review process in place? Is there evidence of remediation of identified issues? | Y/N | N | Quarterly review of a vendors providing Foreclosure Bankruptcy, Loss mitigation and other Mortgage services.<br><br>**Error Definition:**  Failure on any one of the test questions for this metric. | 1.  Is there evidence of documented oversight policies and procedures demonstrating compliance with vendor oversight provisions: (i) adequate due diligence procedures, (ii) adequate enforcement procedures (iii) adequate vendor performance evaluation procedures (iv) adequate remediation procedures?[3]<br>2.  Is there evidence of periodic sampling and testing of foreclosure documents (including notices of default and letters of reinstatement) and bankruptcy documents prepared by vendors on behalf of the servicer?<br>3.  Is there evidence of periodic sampling of fees and costs assessed by vendors to; (i) substantiate services were rendered (ii) fees are in compliance with servicer fee schedule (iii) Fees are compliant with state law and provisions of the servicing standards?<br>4.  Is there evidence of vendor scorecards used to evaluate vendor performance that include quality metrics (error rate etc)?<br>5.  Evidence of remediation for vendors who fail metrics set forth in vendor scorecards and/or QC sample tests consistent with the servicer policy and procedures? |
| B. Customer Portal | **Implementation of a customer portal.** | **Y/N** | **N** | **A Quarterly testing review of Customer Portal.** | 1.  Does the portal provide loss mitigation status updates? |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Metric | Measurements | Loan Level Tolerance for Error[1] | Threshold Error Rate[2] | Test Loan Population and Error Definition | Test Questions |
| C. SPOC | Implement single point of contact ("SPOC"). | Y/N 5% for Question 4 | N For Question #4: 5% | Quarterly review of SPOC program per provisions in the servicing standard.<br><br>**Population Definition (for Question 4):** Potentially eligible borrowers who were identified as requesting loss mitigation assistance.<br><br>**Error Definition:**  Failure on any one of the test questions for this metric. | 1. Is there evidence of documented policies and procedures demonstrating compliance with SPOC program provisions?<br>2. Is there evidence that a single point of contact is available for applicable borrowers?<br>3. Is there evidence that relevant  records relating to borrower's account are available to the borrower's SPOC?<br>4. Is there evidence that the SPOC has been identified to the borrower and the method the borrower may use to contact the SPOC has been communicated to the borrower? |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| **Metric** | **Measurements** | **Loan Level Tolerance for Error**[1] | **Threshold Error Rate**[2] | **Test Loan Population and Error Definition** | **Test Questions** |
| D. Workforce Management | Training and staffing adequacy requirements. | Y/N | N | Loss mitigation, SPOC and Foreclosure Staff.<br><br>**Error Definition:** Failure on any one of the test questions for this metric. | 1. Is there evidence of documented oversight policies and procedures demonstrating effective forecasting, capacity planning, training and monitoring of staffing requirements for foreclosure operations?<br>2. Is there evidence of periodic training and certification of employees who prepare Affidavits sworn statements or declarations. |

| A | B | | C | D | E |
|---|---|---|---|---|---|
| **Metric** | **Measurements** | **Loan Level Tolerance for Error[1]** | **Threshold Error Rate[2]** | **Test Loan Population and Error Definition** | **Test Questions** |
| E.  Affidavit of Indebtedness Integrity. | Affidavits of Indebtedness are signed by affiants who have personal knowledge of relevant facts and properly review the affidavit before signing it. | Y/N | N | Annual Review of Policy. | 1. Is there evidence of documented policies and procedures sufficient to provide reasonable assurance that affiants have personal knowledge of the matters covered by affidavits of indebtedness and have reviewed affidavit before signing it? |
| F.  Account Status Activity. | System of record electronically documents key activity of a foreclosure, loan modification, or bankruptcy. | Y/N | N | Annual Review of Policy. | 1. Is there evidence of documented policies and procedures designed to ensure that the system of record contains documentation of key activities? |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| | | **Loan Level Tolerance for Error**[1] | **Threshold Error Rate**[2] | | |
| **Metric** | **Measurements** | | | **Test Loan Population and Error Definition** | **Test Questions** |
| **6. Customer Experiences** | | | | | |
| **A. Complaint response timeliness** | Meet the requirements of Regulator complaint handling. | N/A | 5% | **Population Definition: Government submitted complaints and inquiries from individual borrowers who are in default and/or have applied for loan modifications** received during the three months prior to 40 days prior to the review period. (To allow for response period to expire).<br><br>**Error Definition:** # of loans that exceeded the required response timeline. | 1. Was written acknowledgment regarding complaint/inquires sent within 10 business days of complaint/inquiry receipt?**<br>2. Was a written response ("Forward Progress") sent within 30 calendar days of complaint/inquiry receipt?**<br><br>**receipt= from the Attorney General, state financial regulators, the Executive Office for United States Trustees/regional offices of the United States Trustees, and the federal regulators and documented within the System of Record. |
| **B. Loss Mitigation** | | | | | |
| i. Loan Modification Document Collection timeline compliance | | N/A | 5% | **Population Definition:** Loan modifications and loan modification requests (packages) that that were missing documentation at receipt and received more than **40** days prior to the end of the review period.<br><br>**Error Definition:** The total # of loans processed outside the allowable timelines as defined under each timeline requirement tested. | 1. Did the Servicer notify borrower of any known deficiency in borrower's initial submission of information, no later than 5 business days after receipt, including any missing information or documentation?<br>2. Was the Borrower afforded 30 days from the date of Servicer's notification of any missing information or documentation to supplement borrower's submission of information prior to making a determination on whether or not to grant an initial loan modification? |

| A | B | | C | D | E | F |
|---|---|---|---|---|---|---|
| **Metric** | **Measurements** | | **Loan Level Tolerance for Error**[1] | **Threshold Error Rate**[2] | **Test Loan Population and Error Definition** | **Test Questions** |
| ii. Loan Modification Decision/Notification timeline compliance | | | | 10% | **Population Definition:** Loan modification requests (packages) that are denied or approved in the review period.<br><br>**Error Definition:** The total # of loans processed outside the allowable timelines as defined under each timeline requirement tested. | 1. Did the servicer respond to request for a modification within 30 days of receipt of all necessary documentation?<br>2. Denial Communication: Did the servicer notify customers within 10 days of denial decision? |
| iii. Loan Modification Appeal timeline compliance | | | | 10% | **Population Definition:** Loan modification requests (packages) that are borrower appeals in the review period.<br><br>**Error Definition:** The total # of loans processed outside the allowable timeline tested. | 1. Did Servicer respond to a borrowers request for an appeal within 30 days of receipt? |
| iv. Short Sale Decision timeline compliance | | | | 10% | **Population Definition:** Short sale requests (packages) that are complete in the three months prior to 30 days prior to the end of the review period. (to allow for short sale review to occur).<br><br>**Error Definition:** The total # of loans processed outside the allowable timeline tested. | 1. Was short sale reviewed and a decision communicated within 30 days of borrower submitting completed package? |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| **Metric** | **Measurements** | **Loan Level Tolerance for Error**[1] | **Threshold Error Rate**[2] | **Test Loan Population and Error Definition** | **Test Questions** |
| v. Short Sale Document Collection timeline compliance | | | 5% | **Population Definition:** Short sale requests (packages) missing documentation that are received in the three months prior to 30 days prior to the end of the review period (to allow for short sale review to occur).<br><br>**Error Definition:** The total # of loans processed outside the allowable timeline tested. | 1. Did the Servicer provide notice of missing documents within 30 days of the request for the short sale? |
| vi. Charge of application fees for Loss mitigation | | | 1% | **Population Definition:** loss mitigation requests (packages) that are Incomplete, denied, approved and borrower appeals in the review period.<br><br>(Same as 6.B.i)<br><br>**Error Definition:** The # of loss mitigation applications where servicer collected a processing fee. | 1. Did the servicer assess a fee for processing a loss mitigation request? |
| vii. Short Sales | | | | | |
| a. Inclusion of notice of whether or not a deficiency will be required | Provide information related to any required deficiency claim. | n/a | 5% | **Population Definition:** Short sales approved in the review period.<br><br>**Error Definition:** The # of short sales that failed any one of the deficiency test questions | 1. If the short sale was accepted, did borrower receive notification that deficiency or cash contribution will be needed?<br>2. Did borrower receive in this notification approximate amounts related to deficiency or cash contribution? |
| viii. Dual Track | | | | | |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| **Metric** | **Measurements** | **Loan Level Tolerance for Error[1]** | **Threshold Error Rate[2]** | **Test Loan Population and Error Definition** | **Test Questions** |
| a. Referred to foreclosure in violation of Dual Track Provisions | Loan was referred to foreclosure in error. | n/a | 5% | **Population Definition:** Loans with a first legal action date in the review period.<br><br>**Error Definition:** The # of loans with a first legal filed in the review period that failed any one of the dual tracking test questions. | 1. Was the first legal action taken while the servicer was in possession of an active, complete loan modification package (as defined by the Servicing Standards) that was not decisioned as required by the standards?<br>2. Was the first legal commenced while the borrower was approved for a loan modification but prior to the expiration of the borrower acceptance period, borrower decline of offer or while in an active trial period plan? |
| b. Failure to postpone foreclosure proceedings in violation of Dual Track Provisions | Foreclosure proceedings allowed to proceed in error. | n/a | 5% | **Population Definition:** Active foreclosures during review period.<br><br>**Error Definition:** # of active foreclosures that went to judgment as a result of failure of any one on of the active foreclosure dual track test question. | 1. Did the servicer proceed to judgment or order of sale upon receipt of a complete loan modification package within 30 days of the Post-Referral to Foreclosure Solicitation Letter?**<br><br>**Compliance of Dual tracking provisions for foreclosure sales are referenced in 1.A |
| **C. Forced Placed Insurance** | | | | | |
| i. Timeliness of notices | Notices sent timely with necessary information. | n/a | 5% | **Population Definition:** Loans with forced placed coverage initiated in review period.<br><br>**Error Definition**: # of loans with active force place insurance resulting from an error in any one of the force-place insurance test questions. | 1. Did Servicer send all required notification letters (ref. V 3a i-vii) notifying the customer of lapse in insurance coverage?<br>2. Did the notification offer the customer the option to have the account escrowed to facilitate payment of all insurance premiums and any arrearage by the servicer prior to obtaining force place insurance?<br>3. Did the servicer assess forced place insurance when there was evidence of a valid policy? |
| ii Termination of Force place Insurance | Timely termination of force placed insurance. | | 5% | **Population Definition:** Loans with forced placed coverage terminated in review period.<br><br>**Error Definition:** # of loans terminated force place insurance with an error in any one of the force- place insurance test questions. | 1. Did Servicer terminate FPI within 15 days of receipt of evidence of a borrower's existing insurance coverage and refund the pro-rated portion to the borrower's escrow account? |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Metric | Measurements | Loan Level Tolerance for Error[1] | Threshold Error Rate[2] | Test Loan Population and Error Definition | Test Questions |
| **D. Transfer of Servicing Rights** | | | | | |
| i. Transfer of servicing to Servicer | Accept, and continue to process pending loan modification requests from the prior servicer and honor loan modification agreements entered into by the prior servicer. | n/a | 5% | **Population Definition:** Loans or loan servicing rights sold or transferred to the servicer during the review period, including for subservicing, with a pending loan modification request (in process) or a trial or permanent modification at the time of sale or transfer.<br><br>**Error Definition:** # of loans with an error in any one of the transfer or servicing test questions. | 1. Did the Servicer accept and continue to process pending loan modification request of the prior servicer?<br>2. Did the Servicer honor trial and permanent loan modification agreements entered into by the prior servicer? |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| | | Loan Level Tolerance for Error[1] | Threshold Error Rate[2] | | |
| Metric | Measurements | | | Test Loan Population and Error Definition | Test Questions |
| # 30 | | | | | |
| Standards:<br><br>N/A | Loan Modification Process | Y/N for Questions 1 - 3 | 5% | **Population Definition:**<br><br>1st lien borrowers declined in the review period for incomplete or missing documents in their loan modification application.[4]<br><br>**Error Definition:**<br><br>Loans where the answer to any one of the test questions is a No. | 1. Is there evidence Servicer or the assigned SPOC notified the borrower in writing of the documents required for an initial application package for available loan modification programs?<br>2. Provided the borrower timely submitted all documents requested in initial notice of incomplete information ("5 day letter") or earlier ADRL letters, did the Servicer afford the borrower at least 30 days to submit the documents requested in the Additional Document Request Letter ("ADRL") before declining the borrower for incomplete or missing documents?<br>3. Provided the borrower timely submitted all documents requested in the initial notice of incomplete information ("5-day letter") and earlier ADRL letters, did the Servicer afford the borrower at least 30 days to submit any additional required documents from the last ADRL before referring the loan to foreclosure or proceeding to foreclosure sale? |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| | | Loan Level Tolerance for Error[1] | Threshold Error Rate[2] | | |
| Metric | Measurements | | | Test Loan Population and Error Definition | Test Questions |
| # 31 | | | | | |
| Standards:<br><br>IV.C.4 g<br>IV.G 2.a | Loan Modification Denial Notice Disclosure | Y/N for Questions 1 - 2 | 5% | **Population Definition:**<br><br>1st lien borrowers declined in the review period for a loan modification application.<br><br>**Error Definition:**<br><br>Loans where the answer to any one of the test questions is a No. | 1. Did first lien loan modification denial notices sent to the borrower provide:<br>  a. the reason for denial;<br>  b. the factual information considered by the Servicer; and<br>  c. a timeframe for the borrower to provide evidence that the eligibility determination was in error?<br>2. Following the Servicer's denial of a loan modification application, is there evidence the Servicer or the assigned SPOC communicated the availability of other loss mitigation alternatives to the borrower in writing? |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| | | Loan Level Tolerance for Error[1] | Threshold Error Rate[2] | | |
| Metric | Measurements | | | Test Loan Population and Error Definition | Test Questions |
| # 32 | | | | | |
| Standards:<br><br>IV.C.2 | SPOC Implementation and Effectiveness | Y/N for Questions 1 - 3 | 5% for Question 1<br><br>Y/N for Questions 2 - 3 | **Population Definition:**<br><br>For Question 1: 1st lien borrowers who were reassigned a SPOC for loss mitigation assistance in the review period<br><br>For Question 2 and 3: Quarterly review of policies or procedures<br><br><br>**Error Definition:**<br><br>Failure on any one of the test questions for this Metric. | 1. Is there evidence that Servicer identified and provided updated contact information to the borrower upon assignment of a new SPOC if a previously designated SPOC is unable to act as the primary point of contact?<br>2. Is there evidence of implementation of management routines or other processes to review the results of departmental level SPOC scorecards or other performance evaluation tools?[5]<br>3. Is there evidence of the use of tools or management routines to monitor remediation, when appropriate, for the SPOC program if it is not achieving targeted program metrics? |

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| | | Loan Level Tolerance for Error[1] | Threshold Error Rate[2] | | |
| Metric | Measurements | | | Test Loan Population and Error Definition | Test Questions |
| # 33 | | | | | |
| Standards:<br><br>I.B.5 | Billing Statement Accuracy | For test question 1: Amounts overstated by the greater of $99 or 1% of the correct unpaid principal balance.<br><br>For test questions 2 and 3: Amounts overstated by the greater of $50 or 3% of the total balance for the test question | 5% | **Population Definition:** Monthly billing statements sent to borrowers in the review period. [6]<br><br>**Error Definition:**<br><br>The # of Loans where the net sum of errors on any one of the test questions exceeds the applicable allowable tolerance. | 1. Does the monthly billing statement accurately show, as compared to the system of record at the time of the billing statement, the unpaid principal balance?<br>2. Does the monthly billing statement accurately show as compared to the system of record at the time of the billing statement each of the following:<br>   a. total payment amount due; and,<br>   b. fees and charges assessed for the relevant time period?<br>3. Does the monthly billing statement accurately show as compared to the system of record at the time of the billing statement the allocation of payments, including a notation if any payment has been posted to a "suspense or unapplied funds account"? |

[1] Loan Level Tolerance for Error: This represents a threshold beyond which the variance between the actual outcome and the expected outcome on a single test case is deemed reportable

[2] Threshold Error Rate: For each metric or outcome tested if the total number of reportable errors as a percentage of the total number of cases tested exceeds this limit then the Servicer will be determined to have failed that metric for the reported period.

[3] For purposes of determining whether a proposed Metric and associated Threshold Error Rate is similar to those contained in this Schedule, this Metric 5.A shall be excluded from consideration and shall not be treated as representative.

[4] The population includes only borrowers who submitted the first document on or before the day 75 days before the scheduled or expected foreclosure sale date.

This Metric is subject to applicable investor rule requirements.

Nothing in this Metric shall be deemed to prejudice the right of a Servicer to decline to evaluate a borrower for a modification in accordance with IV.H.12.  Specifically, Servicer shall not be obligated to evaluate requests for loss mitigation options from (a) borrowers who have already been evaluated or afforded a fair opportunity to be evaluated consistent with the requirements of HAMP or proprietary modification programs, or (b) borrowers who were evaluated after the date of implementation of this Agreement, consistent with this Agreement, unless there has been a material change in the borrower's financial circumstances that is documented by borrower and submitted to Servicer.

[5] The following evidence is considered appropriate using a qualitative assessment:
- Documents that provide an overview of the program, policy or procedures related to periodic performance evaluations, including the frequency thereof; or
- Sample departmental level SPOC scorecard or other performance evaluation tools that reflect performance and quality metrics, evidence of the use of thresholds to measure non-performance, identifiers when remediation is required and evidence that such remediation was identified by management, when appropriate.

[6] This Metric is N/A for borrowers in bankruptcy or borrowers who have been referred to or are going through foreclosure.